**Application of Sydney M. SPATZ and Marvin Koral.**

**Patent Appeal No. 7666.**

United States Court of Customs and Patent Appeals.

Dec. 14, 1967.

Kenneth D. Tremain, Frederick H. Weinfeldt, George B. Campbell, New

York City, and Michael S. Jarosz, Madison, N. J., for appellants.

Joseph Schimmel, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

This appeal is from a decision of the Board of Appeals affirming the rejection of claims 1–12 in appellants' application[1] for "Fire-Retardant Composition Derived from Tetrabromophthalic Acid Anhydride," as "unpatentable" in view of certain prior art.

The subject matter is reflected in claims 1 and 6:

1. A method of preparing polyester resins that have fire-retardant characteristics when cured, which comprises: preparing a mixture of glycol and a component of the group consisting of saturated dicarboxylic acids and anhydrides thereof, said component containing at least 10 mol percent of tetrabromophthalic acid anhydride that has not above about 5 ppm. of ferric iron impurity associated therewith, and heating said mixture to form a polyester therefrom.

6. A polyester resin that has fire-retardant characteristics when cured, which comprises the reaction product of glycol and a component of the group consisting of saturated dicarboxylic acids and anhydrides thereof that contain at least 10 mol percent of tetrabromophthalic acid anhydride that has not above about 5 ppm. of ferric iron impurity associated therewith.

The feature of the claims asserted to be nonobvious is the use of at least 10 mol percent of tetrabromophthalic acid anhydride (TBPAA) that has not more than 5 parts/million (ppm) ferric iron impurity as the acid component of a fire-retardant polyester resin.

The references are:

| | | |
|---|---|---|
| Lundberg | 2,819,247 | January 7, 1958. |
| Phillips et al. | 2,921,925 | January 19, 1960. |
| O'Neill | 2,899,466 | August 11, 1959. |
| Tate | 3,047,621 | July 31, 1962. |
| Hoffman | 3,007,943 | November 7, 1961. |
| Wismer et al. | 3,060,146 | October 23, 1962. |

Bjorksten, Polyesters and Their Application, pub. 1956, Reinhold Publishing Corp., New York, N. Y., page 160.[2]

A detailed discussion of the Lundberg, Phillips and Wismer references is unnecessary, since appellants admit that the art, as represented by those references,

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

[1]. Serial No. 6,635, filed February 4, 1960. The appeal was originally argued Oct. 6, 1966. Reargument was heard Oct. 4, 1967.

[2]. The examiner cited Bjorksten to show that diallyl phenyl phosphonate and hexachloroendomethylene tetrahydrophthalic acid anhydride, materials recited in some of the claims, are conventional components of flame resistant polyester resins. Appellants do not argue otherwise.

Appellants ask us to take judicial notice of an article published in Chemical and Engineering News about 4 years after appellants' filing date. Appellants made a similar request to the board but the board refused to consider the article because it was not presented to the examiner during prosecution. Under the circumstances, the article is not properly before us and will not be considered. In re Cofer, 354 F.2d 664, 53 CCPA 830.

knew that TBPAA "could be used in the preparation of polyesters with fire-retardant properties."

Mindful of a similar concession below, the board sustained the examiner's rejection of the claims as "unpatentable over" Lundberg alone or considered with Phillips. With respect to the limitation in the claims calling for not more than about 5 ppm of ferric impurity, the board stated:

* * * One skilled in this art would not be expected to employ an impure reactant, but would follow normal chemical practice and use a pure phthalic anhydride in the esterification. Since the references are silent as to any content of ferric ion it cannot be presumed that such ion is necessarily present in the starting material. * * * We therefore agree with the Examiner that a pure or iron-free reactant would normally be employed, thus rendering obvious appellants' contribution.

We also note there to be no evidence in this record that all commercially available tetrabromophthalic anhydride would necessarily contain ferric ion in a proportion above the 5 ppm which appellants consider to be the operative limit of their contribution. The use of commercially available tetrabromophthalic anhydride having a low iron content is equally obvious in the polyesterifications of the prior art as the high iron content urged by appellants.

The board found it to be apparent from the background references cited by the examiner that purified phthalic acids *would* normally be employed by one of ordinary skill in the art in various esterification reactions. O'Neill, for example, discloses the desirability of removing colored impurities in terephthalic acid prior to using it in the manufacture of polyester fibers and films in order to obtain a product having good color. Tate removes certain impurities

from various phythalic acids prior to preparing polyesters therefrom in order to improve the speed of the esterification reaction as well as the color, crystallinity and melting point of the ultimate polyester. Hoffman discloses that crystalline tetrachlorophthalic acid anhydride [3] "must be thoroughly purified" before it may be used for industrial purposes, and details a process for the *removal* of *ferric iron* and other impurities therefrom to obtain a product with the degree of purity required for use in the plastics and dye industries.

While appellants concede that those in the art were aware that TBPAA could be used in the preparation of polyesters with fire-retardant properties, they contend that there was a practical industrial problem which made it difficult to prepare polyesters from commercially available TBPAA. Appellants urge that their contribution resides in the "triple-faceted discovery" that: (1) the cause of the difficulty in processes for preparing polyesters with TBPAA resides in the presence of ferric iron in impure TBPAA; (2) the remedy resides in the use of TBPAA containing not more than 5 ppm ferric impurity in the esterification process; and (3) when TBPAA of such purity is used, fire-retardant properties far in excess of expectation are achieved in the products of the process.

We find no reversible error in the manner in which the examiner and board employed the primary and background references as evidence of the obviousness of the claimed subject matter. While such secondary considerations as "long felt but unsolved needs, [and] failure of others" are to be given effect in determining obviousness or nonobviousness under § 103,[4] it is not clear from the evidence in the record here that the industrial problem of which appellants speak in fact existed, or that skilled workers knowledgeable in the art had failed to find any solution to the prob-

3. The record shows that tetrachlorophthalic acid anhydride, like TBPAA, is a material known to be useful in formation of fire-retardant polyesters.

4. See Graham v. John Deere Co. of Kansas City, 383 U.S. 1 at 17, 18, 35 and 36, 86 S.Ct. 684, 15 L.Ed.2d 545.

lem. See In re Allen, 324 F.2d 993, 997, 51 CCPA 809, 813–814. Indeed, the one tangible, extraneous piece of evidence appellants cite in their specification in an effort to show that a problem did exist [5] is in marked contrast with the later disclosures of Phillips and Wismer, who speak matter-of-factly of the use of TBPAA in forming polyesters as if no problem existed at all.

In further support of their arguments, appellants point to Example II (particularly Table 1) and Example V of their application. We do not think those examples support appellants' assertions of nonobviousness of the process and composition claims. With respect to the professed criticality of the use of TBPAA containing the claimed ferric ion content to facilitate an allegedly difficult esterification reaction, it is true that Example V of the specification states that "No polyester could be produced" when a sample of "commercial" grade TBPAA, containing 34 ppm ferric impurity, was employed in the esterification process, while the use of "purified" TBPAA containing 1.2 to 5 ppm of ferric iron "consistently produced polyesters." However, the specification also states that "technical" grade TBPAA, said in Example III to be prepared by "the conventional method wherein phthalic acid anhydride is brominated in the presence of oleum" and to contain 8 ppm ferric impurity, *"did not consistently* produce polyesters" when used in the esterification process. (Emphasis supplied). The record contains no data to further elucidate what the expression "did not consistently" means in the present context. It seems apparent that the phrase is broad enough to allow production of polyesters from "technical" grade TBPAA containing 8 ppm ferric impurity as infrequently as 1 out of a 100 times, or, for that matter, as frequently as 99 out of a 100 times. We do not think the equivocal, relative language employed by appellants establishes that a problem necessarily existed with respect to the use of the "technical" grade TBPAA of the prior art or the criticality of the claimed ferric iron content they allege here.

Insofar as the efficacy of Example II of the application to show nonobviousness of the claimed polyester composition is concerned, it should be noted that appellants have only shown that resins produced from TBPAA containing less than 5 ppm ferric impurity have superior fire-retardant properties vis-à-vis resins produced from *other* phthalic acids, subject matter not relied on by the Patent Office in the rejection. There is no comparison of the fire-retardant properties of the claimed resin with like properties of a resin produced from TBPAA containing slightly more than 5 ppm ferric impurity.

While we appreciate appellants' arguments, we are satisfied the board committed no reversible error in sustaining the rejection.

The decision is affirmed.

Affirmed.

ALMOND, Judge (concurring).

The question before us is whether, at the time the invention was made, it was or was not obvious to use TBPAA having less than 5 ppm ferric iron in a polyesterification reaction. · It seems clear that if TBPAA having the required degree of purity was in fact readily commercially available at the time the invention was made, it would have been quite obvious to use it in such reactions, particularly in view of the suggestion of Hoffman that ferric iron is desirably removed from the very similar compound tetrachlorophthalic acid anhydride before its use in plastics production.

---

5. The specification says:
    * * * it has been stated that attempts to incorporate desirable flame-retardant properties into high polymer polyesters by use of chloro- and bromo-derivatives of phthalic anhydride for use in surface coatings have been either unsuccessful or economically unattractive (Kirk-Othmer, Encyclopedia of Chemical Technology, Volume 10, page 595—Interscience Encyclopedia, Inc., 1953).

On the other hand, if all TBPAA which was commercially available at the time the invention was made had a high iron content and hence was unusable in polyesterification reactions, it would appear that appellants have made an advance in the art by recognizing a solution to an existing problem. Such a solution can be given effect in determining the obviousness or nonobviousness under section 103.

Our problem, therefore, seems to revolve about the availability or nonavailability of TBPAA of low ferric iron content at the time the invention was made. The evidence on both sides of the question is meager.

First of all, appellants concede that TBPAA had previously been used to form polyesters. This is in agreement with the teachings of the references. Now, since appellants tell us that no reaction at all will occur at high ferric iron contents, it stands to reason that the prior art had available TBPAA having relatively low ferric iron content. Whether the ferric iron content was within the 5 ppm level where consistently good results are obtained, or slightly above that level where results are inconsistent, is something we do not know. We are told by appellants' Example III that they prepared "technical" grade TBPAA by the "conventional" method and achieved an 8 ppm ferric iron content material, presumably without any post-reaction purification 'steps whatever. We receive no guidance whatever on whether this 8 ppm content is a normal, low, or high level of ferric iron for commercially available "technical" grade material. However, we can infer from this example that "technical" grade TBPAA having ferric iron content on the order of 8 ppm was available to the art.

The only other evidence before us is that the commercially available TBPAA used in appellants' experimental work contained 34 ppm. But this does not tell us how many other commercial suppliers there may have been, or how many different grades of material were available.

It is argued that the mere fact that appellants went to the expense of filing a patent application is some evidence that they had found a solution to an existing problem. This argument is entitled to little, if any, weight. At best, the filing of a patent application shows that appellants *thought* they had solved a problem. This could mean merely that appellants had not investigated sources of TBPAA, and that the only problem which existed was in their own laboratory.

It seems to us that an applicant who urges patentability based upon solution of a recognized but previously unsolved problem must carry the burden of showing that a problem in truth existed and was recognized in the art. In re Allen, 324 F.2d 993, 51 CCPA 809. The burden is even heavier where, as here, the art mentions the very reaction involved in the application, but makes no mention whatever of the existence of a problem.

A review of the evidence before us shows that the appellants have not met that burden. The evidence before us tells us only that one commercial source of TBPAA had a high iron content, and it raises an inference that TBPAA having an iron content very close to the claimed level was available to the art. This is a far cry from showing the existence or recognition of a problem in the art. In view of the failure of appellants to show either that TBPAA within their claimed purity range was unavailable, or that if available its use in this application was unobvious, the Board of Appeals was correct in holding that the use of a pure material in a reaction would be expected of one skilled in the art. I therefore concur in affirming the board's decision.

KIRKPATRICK, Judge (concurring).

I agree with the reasoning and conclusions of the majority but I think that I should state briefly the considerations which have influenced my decision.

Unless I have missed the point of the dissenting opinions as well as the appel-

lants' argument, the principal ground upon which my dissenting colleagues would reverse the board's decision is a two-pronged discovery by the appellants that a problem existed in the art and the cause of the problem. It is of course well recognized that the existence of a problem in an industry and its solution by the applicant for a patent may afford evidence on which patentability may be grounded. In Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, the Supreme Court spoke of the circumstances under which those facts may be taken as evidence of nonobviousness. The Court referred to them as "secondary considerations" and specified "long felt but unsolved needs, [and] failure of others."

The difficulty with the appellants' case now before us is the lack of adequate evidence to bring his application within the rule. There is nothing to show that the "problem" which the appellants claim to have solved is anything other than the perennial problem present in every industry, namely, how to improve the quality of the product or to make the process of manufacture more efficient. Certainly the mere fact that an applicant for a patent has succeeded in making an improvement in product or process is never of itself evidence of nonobviousness. It must appear that what he has done is not within the skill of the ordinary practitioner of the art. Here nothing has been offered to show that any problem other than the problem of how to improve the product and process existed.

It seems to me that if the appellants in this case wished to predicate patentability on the discovery of the existence of the problem in the art, it was incumbent upon them to furnish more evidence than is present in the record here to show that the industry ever had the slightest concern about any alleged problem or that anyone ever tried to solve it. It would seem that if a worker skilled in the art set about improving the fire retardant composition and method of manufacture which is the subject of the application, it would be an obvious step to ascertain if and to what extent impurities existed in the materials used in the process and then to purify. I do not think that the few vague statements in the appellants' specification and the rather uninformative reference to a chemical encyclopedia constitute evidence upon which a finding of patentability can be made.

RICH, Judge (dissenting).

In this twice-argued case,[1] my colleagues have already said so much that I would remain silent if I did not feel strongly that there is more to be said and that it is important to the correct decision of this case to say it.

Perhaps one of the difficulties in this case is the way the invention (which is really a two-pronged *discovery*) is claimed in accordance with the common practice of defining the end *product* in which the invention is embodied or the *process* of making it by claims reciting everything that is old as though it were part of the invention and including, by way of distinction, *the one novel feature*, without in any way pointing out in the claims either that it is the sole novelty or that it alone is what was invented or discovered. This claim practice has been going on for so long that appellants should not be penalized for using it, as it seems to me they have been. The fact remains that such claiming technique is far from compliance with the requirement of 35 U.S.C. § 112, second paragraph, to include claims

* * * particularly *pointing out* and *distinctly* claiming the subject matter which the applicant regards as *his* invention. [My emphasis.]

1. The second argument was due to the fact that the judges remaining on the court when this case first came to a vote, after the death of Judge Martin, were equally divided and appellants elected to reargue it before a full court, which was created by adding Judge Kirkpatrick to the four, by designation. A full reargument was held, both parties appearing.

The Patent Office did nothing to bring about better compliance.

This manner of claiming has opened up the invention sought to be protected to a false and misleading analysis in both the Patent Office and this court. For example, both the majority and concurring opinions speak of *admissions* and *concessions* of the appellants that the use of TBPAA in polyester compositions to make them fire-retardant is old in the art as though appellants had asserted that to be their invention and had then been forced to back away from the assertion by citation of references unknown to them. Nothing could be further from the truth. As the examiner said in his Answer, the applicants stated on page 1 of their original specification that they were not the first to use TBPAA as a component of a polyester resin. Why, then, characterize this fact, on the basis of which the disclosure of the invention proceeded, as an "admission" or "concession"? These are words of denigration applied to people who are forced to recede from a position they have taken. Appellants never did this. It creates a false atmosphere for intelligent and fair decision.

Claims, ineffective though they may be in their traditional forms to point out distinctly what was invented—having been forced into such forms by court interpretations and Patent Office practice through the years—must nevertheless be construed in the light of the specification. What, then, did appellants describe in their specification as their invention? Their very first statement is that the art knew about making fire-retardant polyesters containing halogenated phthalic acids including tetrachloro- and tetrabromophthalic acids and anhydrides (which includes TBPAA) as the fire-retardant components. Against this background, appellants then state that *their* discoveries in this art fall into two categories: (1) discovery of "the astonishing superiority of the tetrabromophthalic acid anhydride [TBPAA] over the other halogenated anhydrides in the production of flame-retardant com-

positions *when prepared in accordance with the present invention*" (emphasis mine); (2) a second discovery, implied in the italicized portion of the just quoted statement, namely, that *successful* use of the TBPAA for this purpose has been discovered by them to depend on reducing ferric iron impurity in the TBPAA to *below 5 parts per million* (ppm.).

Now, clearly patentability could not be predicated on (1) above, the mere discovery of the *superiority* of compositions using TBPAA, in view of the acknowledged suggestions in the art that it be used for this very purpose, even though the art, having proposed its use, along with many other related compounds, had not recognized the superiority. Discovery (1), therefore, is of no legal significance, at least with respect to product claims.

As to discovery (2), which is a stated limitation in every claim, appellants clearly appear to have advanced the art, delivered a *quid pro quo, by discovering something the art did not know and disclosing that discovery;* and, further, so far as the record shows, there was nothing obvious to those skilled in the art about that discovery. With respect to it the art appears to have been in total darkness. It knew nothing about the practical necessity of reducing the ferric iron in the TBPAA to less than 5 ppm. This, obviously, is a matter of "purity," a subject I will discuss presently, but first I wish to state what I think is wrong with the approaches to the problem taken by my brothers.

The majority and concurring opinions both refer to In re Allen, 324 F.2d 993, 51 CCPA 809, misconstruing it, as I read those opinions, as standing for the proposition that solving a problem is of no moment in determining obviousness unless the problem was not only *existing* but *known to those skilled in the art to exist.* A problem is no less a problem when it has not yet been recognized. A large part of many important inventions resides in discovering that there *is* a problem. Two entirely different situa-

tions are here being confused. (a) My understanding of *Allen*, representing one situation, is that *if* solution of a long-standing problem in the art is relied on as *evidence* of unobviousness, it is necessary to show knowledge of the problem by those in the art and efforts to solve it. That is not, of course, the situation here. (b) The second situation is one in which unobviousness is predicated on the discovery of an *unobvious problem* and its solution. That is the case we have here. We have often said that patentability may be predicated on finding the cause of a difficulty even when its cure is obvious, once it is revealed. I would add that discovering the *existence of the difficulty* may be fully as significant.

Judge Almond's opinion states, and I agree, that "it would appear that appellants have made an advance in the art by recognizing a solution to an *existing* problem" (my emphasis), but confuses *existence* with *art recognition* in conditioning that statement on finding it to be a fact that "all TBPAA which was *commercially available* at the time the invention was made had a high iron content and hence was unusable in polyesterification reactions." Of course the record shows no such fact. It does not really show that TBPAA was a "commercially available" product from more than a single source mentioned by ap-

pellants. *All* we know about iron (ferric iron) content of TBPAA, commercial or otherwise, is what appellants tell us in their specification, as the opinion goes on to detail, referring to appellants' Examples III and V(a) (quoted infra). The significant fact here, however, is that the *prior art references* tell us nothing. I am aware of what Hoffmann tells us about *removing* ferric chloride from a related compound, tetrachlorophthalic acid, but I am also aware that he speaks of attaining "the *degree* of purity required for industrial purposes" (my emphasis), without saying what it is and, further, that all his claims refer to a "purified" compound "*substantially free of impurities*" (my emphasis). There is no recognition anywhere of the significance of such small amounts as 5 ppm. The one example (V), in which Hoffmann indicates the *amount* of $FeCl_3$ he considers to be an "impurity" to be got rid of, says it is "about 3%." That is, I believe, 30,000 ppm. Query: does his "purification" process assure there is not so much as 8 ppm. iron left, which appellants teach the art is enough to make esterification results inconsistent? This brings me to consideration of the term "pure" and its practical relation to such an amount as the "not above 5 ppm." in the claims.

Hackh's Chemical Dictionary, 3d Ed., states under "chemicals":

The *grade* or the purity of chemicals on the market are [sic]:

C.P. ................ chemically pure, the highest grade.
U.S.P. or B.P. ......... tested to conform with the requirements of the U. S. or British Pharmacopoeia, respectively.
A.R. ................ analytical reagent
pure ................ of sufficient purity for general work.
tech. ................ a purity sufficient for technical work.
crude ............... an impure grade.

———————

The board predicated its decision largely on the notion, for which there is no support in the record other than its opinion, that

One skilled in this art would not be expected to employ an impure reactant, but would follow normal chemical practice and use a *pure* phthalic anhydride

in the esterification. Since the references are silent as to *any* content of ferric ion it cannot be presumed that such ion is necessarily present in the starting material. [Emphasis mine.]

It is very significant that "the references are silent" on the key fact in this case and I shall not labor the point except to reverse the board's observation to say that in view of the silence it cannot be presumed ferric ion is necessarily absent in "pure" starting material.

The board's statement about "normal chemical practice" is absolutely meaningless to me in the context of this case by reason of the vagueness of the term "pure." As the above quotation from Hackh amply demonstrates, "pure" does not normally mean chemically pure for when the latter is intended it is specified. "Pure" in the usual sense is a relative term meaning, according to Hackh, "sufficient purity for general work" and is quite broad enough to encompass as much as 8 ppm. of some impurity. I find further support for this, even with respect to C.P. chemicals, in Chemicals of Commerce, Snell and Snell (Van Nostrand, 1939), p. 1:

> The term C.P. stands for chemically pure. Materials bearing this label may be supposed to contain a minimum of impurities, but the term is somewhat general and does not mean specifically 100 per cent pure. Strictly speaking, no chemical is absolutely pure although the known impurities may be expressed as present to the extent of 0.0001 per cent. * * *
>
> * * * * * *
>
> The term technical or technical grade is applied to products as they are commonly produced on a large scale. The degree of purity of technical products varies with the individual substances and depends on the ease with which contaminants are removed during the manufacturing process. Such relative terms as crude and refined are also used.

Appellants, presumably skilled in this art and using chemical terminology knowledgeably, made the following statement in their specification, apparently so far overlooked by everyone:

> The brominated product [TBPPA] is obtained contaminated with an impurity, either physically absorbed or molecularly complexed, such that *by the usual methods of purification the contaminant is not entirely removed.* [Emphasis mine.]

It seems to me we are justified in assuming that the "pure" chemical the board expected to be used in the art would be such a one as has been subjected to the "usual methods of purification" and we are then left with the very problem, unrecognized in the art but nevertheless existing, which was discovered and solved by appellants. It is my opinion from study of the prior art references that it was a very *unobvious* problem or source of difficulty.

I am not able to accept Judge Almond's attempted close reasoning in support of the majority for the further reason that it is predicated, at least in part, on a non-existent supposed "concession" by appellants that TBPAA had previously been *used* to form polyesters, presumably with success. The implication is that it was conceded by appellants to have been *successfully* used, yet we find appellants quoting from Kirk-Othmer's Encyclopedia to the effect that "bromo- derivatives of phthalic anhydride [for fire retarding] * * * have been either unsuccessful or economically unattractive." But aside from that reference to Kirk-Othmer, what the specification actually says is not that TBPAA has been *used* but that it has been "disclosed * * * for use" or "proposed," which is a very different thing. Such disclosures and proposals put TBPAA legally in the prior art but this is not a real use from which, as Judge Almond attempts to do, one can deduce "that the prior art had [commercially] available TBPAA having relatively low ferric iron content." When this deduction loses its foundation, the argument predicated on it collapses.

Equally unconvincing is the majority opinion's attempt to reason, from the disclosures in Phillips and Wismer that

TBPAA *can* be used, that the Kirk-Othmer statement is unpersuasive, at least to anyone familiar with the way disclosures in patent specifications like those relied on come into being. It is quite true those two patents ignore the existence of any problem, just as though none existed. And why not, if it was not appreciated that there was one? It is easy to propose use of a chemical without knowing how it will behave. Both Phillips and Wismer merely list TBPAA among numerous *possible* polycarboxylic acid anhydrides which might be used. Neither indicates it was ever tried. Anyone skilled in this art could make up such a list. Such haystack disclosures are without *evidentiary* value. One cannot deduce anything from them, as from a commercial reality, and that is what the majority opinion is attempting.

On the other hand we have the *experimental* data of appellants' Example V showing the actual effects of the ferric iron content. Its essence is as follows:

In a method of polyester preparation similar to that employed in the previous Examples, wherein 1:1:2.2 molar relationships of TBPAA, maleic anhydride and diethylene glycol were utilized, the following six samples of TBPAA were employed:

|  | Ferric Iron Determination—PPM. |
|---|---|
| (a) TBPAA, obtained commercially from Michigan Chemical Company | 34 |
| (b) Technical TBPAA, prepared as described in Example III | 8 |
| (c) TBPAA that had been methanol-conditioned by the method of Example I(a) | 5 |
| (d) TBPAA that had been methanol-conditioned by the method of Example I(a) | 2 |
| (e) TBPAA conditioned by the sodation method of Example IV(a) | 1.2 |
| (f) TBPAA conditioned by the xylene crystallization method of Example III(a) | 4 |

No polyester could be produced with the use of the Sample (a) above TBPAA component. The use of Sample (b) did not consistently produce polyesters. However, Samples (c) through (f) consistently produced polyesters as previously demonstrated in Examples I–IV, above.

————◆————

The references to conditioning of the TBPAA are to special methods of purification to remove residual ferric iron disclosed in the application at bar and in other applications.

The majority's attempt to shrug off this evidence, particularly the results obtained with Example V(b), 8 ppm. impurity, as being "equivocal" and so not showing the existence of a problem impresses me as a tour de force. Anyone running a chemical plant sees nothing "equivocal" in inability to get consistent results with a given raw material or reactant. It is such a problem as can practically lead to a plant shut-down and abandonment of a process altogether. Besides, that is exactly what the Kirk-Othmer publication suggested, notwithstanding the bland assumption to the contrary of patentees who never tried it.

In summary, the only question we have to decide is the obviousness of appellants' claimed discovery of the impor-

tance of keeping the ferric impurity in TBPAA, used to impart fire-retardant properties to polyesters, below 5 ppm. That question must be decided on the basis of what the prior art of record teaches. It cannot be disputed, it is not in fact disputed by the majority, nor was it disputed by the board, that the prior art references teach nothing on that subject. The majority view rests only on a complicated rationalization based on hindsight which attempts to show that the skill of the art would make it obvious but, for the reasons above discussed, the underpinnings of that rationalization are inadequate logically to sustain it.

I would reverse.

SMITH, Judge (dissenting).

The invention with which we are here concerned is a detailed, limited improvement in the highly technical art of polymerizing certain designated materials for producing fire-retardant compositions. As stated in the specification:

> * * * More particularly, it relates to polymerizable compositions comprising polyesters of polymerizable compositions comprising polyesters of polyhyric alcohols and polycarboxylic acid anhydrides, at least a portion of which is tetrabromophthalic acid anhydride [TBPAA] that gives the products produced therefrom said fire-retardant characteristics; and to processes for the preparation of such polymerizable compositions.

The specification also provides the further background information that:

> The production of flame-retardant polyester resins is of great commercial importance. The expanded use of polyester resins in the coating composition field, which includes increasing application to wall members, structural panels, pipes, electrical contacts and the like, requires that the coatings be resistant to fire and heat deterioration.

Specifically, appellants do not assert nor claim anything but a very specific improvement relating to the critical limits of 5 ppm of the ferric iron impurity in the TBPAA which they assert permits the incorporation of TBPAA in a polyester. The specification characterizes the resultant polyester resins as having "remarkable flame-retardancy when cured." Appellants' position is supported in the specification by detailed and comparative examples of the reactions involved and by test data set forth therein as resulting from controlled experiments which in turn are fully described.

The record herein seems to me to support appellants fully in the following statement in their brief:

> Appellants admit that the art (as represented by the Lundberg, Phillips et al, and Wismer et al references) not only knew that tetrabromophthalic acid anhydride (TBPAA) could be used to prepare polyesters, but was aware that TBPAA could be used in the preparation of polyesters with fire-retardant properties.

> A practical industrial problem existed, however, in the fact that there was difficulty in preparing polyesters from commercially available TBPAA.

> Appellants, thereupon, directed their efforts to solving this industrial problem and made a triple-faceted discovery:

> 1. The cause of the difficulty in preparing polyesters with TBPAA resides in the presence of ferric iron. The following statement made by this Court in In re Antonson, [272 F.2d 948] 47 CCPA 741, 124 U.S.P.Q. 132, 133, is apropos: " * * * the inventive act which entitles an applicant to a patent resides as well in the discovery of the source of trouble as in the application of the remedy." citing Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 67, [43 S.Ct. 322, 67 L.Ed. 523.]

> 2. The remedy resides in utilizing TBPAA with no more than 5 ppm (parts per million) of ferric iron associated therewith. The criticality of 5 parts per million is illustrated in Example V of the specification * *.

3. An unexpected advantage of using TBPAA associated with no more than 5 parts per million of ferric iron is that fire-retardant properties far in excess of expectation are achieved. Table I * * * clearly shows the unexpected advantage with respect to fire-retardant properties achieved by the use of TBPAA associated with a limited amount of ferric iron in relation to the use of TC1PAA (tetrachlorophthalic acid anhydride), PAA (phthalic acid anhydride), and HC1 NAA referred to by the Examiner as "chlorendic acid". Note particularly the column "% Consumed". * * *

With the foregoing as a background, the issue which the majority resolves against appellants is that of obviousness of the claimed invention under 35 U.S.C. § 103.

The examiner's analysis of appellants' invention and the prior art was adopted by the board in affirming the rejection and this in turn underlies the majority's affirmance of the board's decision. It seems to me, however, that the examiner's analysis substitutes *his* view, by a process of hindsight reconstruction, for what Congress has provided in 35 U.S.C. § 103 as the standard by which to determine what would have been obvious to one of ordinary skill in this art at the time of appellants' invention.

Appellants readily admit that of the art cited by the examiner, the Lundberg, Phillips, and Wismer patents are representative of the prior art on which appellants' improvement is based. Appellants point out, however, that in addition to not recognizing the esterification problem faced by industry or its solution, not one of these references recognizes the special significance of limiting the iron impurity of TBPAA. Lundberg does not mention TBPAA and Phillips and Wismer merely disclose TBPAA as "one among many" of the materials which may be used.

The examiner in his answer ignored the *precise* limitations in appellants' disclosure and claims and incompletely described appellants' invention as follows:

The invention relates to a process of preparing fire retardant polyester resins from a glycol, a dicarboxylic acid which may be α-β-ethylenically unsaturated, and at least 10 mol per cent of tetrabromophthalic anhydride of a specific ferric iron content. The polyesters, when unsaturated, may be combined with unsaturated monomers and cured.

It should be noted that the examiner at this point apparently did not consider what appellants have asserted to be the *critical* limitation in their discovery, i. e., that producing the product depends on the incorporation in the product of the minimal stated amount of TBPAA having the ferric iron impurity in the TBPAA not above 5 ppm.

Thus, appellants' "invention as a whole," which section 103 requires us to consider in arriving at a determination of the issue of obviousness, has a two-fold aspect: 1) an *appreciation* of a problem which, on the record, was unknown to the prior art, and 2) its solution. Both aspects of the invention are discussed in commendable detail in appellants' specification. The error of the examiner, the board, and the majority, traces back to what now seems to have been an incomplete statement in the examiner's Answer as to what appellants have claimed as their invention "as a whole."

The Supreme Court has cautioned against such an analysis of a patent specification and claims. Thus, in United States v. Adams, 383 U.S. 39, 48–49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966) the court stated:

* * * While the claims of a patent limit the invention, and specifications cannot be utilized to expand the patent monopoly * * * it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention * * *. [Citations omitted.]

Thus, under *Adams,* the emphasis is to be placed on ascertaining the *invention.* "Invention" under the *Adams* de-

cision is first a mental act on the part of the inventor, i. e., an understanding of the problem and the conception of a solution for it. The embodiment of the invention as set forth in the specification is evidence pertinent to a consideration of the patentability of that which is disclosed. A specification cannot be *ignored* in determining what the invention is. The failure of the examiner and the board to consider the appellants' specification in *ascertaining* the invention seems to me to warrant reversal. I have set forth in some detail what I consider to be the salient points of appellants' specification which bear on this consideration. This study makes it clear that appellants' invention lies in the claimed relatively narrow advance over the prior art. These "critical" limitations on appellants' invention with respect to the permissible iron content were ignored by the examiner, the board, and the majority.

To the extent the examiner evaluated the limitation in the claims restricting the amount of the ferric iron impurity in the TBPAA used in the reaction, he related it to the purity of one of the reactants and stated:

\* \* \* Applicants rely on the specified ferric iron impurity content of the tetrabromophthalic anhydride as a distinction over the method and product of Lundberg. However, it is not seen that any impurity need be presumed in the reactants, specifically the bromophthalic reactant of the reference. It is considered that the choice or use of a reactant in either a purified or a crude state is within the scope of the patent as well as a matter of choice within the skill of the art. Further, it is presumed that purified reactants would be those of choice unless for some reason a crude reactant was in some respect more desirable. It would appear that a purified reactant would be the more desirable and thus the one of choice and thus the one used in Lundberg. \* \* \*

The issue of obviousness thus seems to have been resolved against appellants in the first instance on the basis of an unsupported presumption thus indulged by the examiner. The board stated:

\* \* \* We therefore agree with the Examiner that a pure or iron-free reactant would normally be employed, thus rendering obvious appellants' contribution.

We also note there to be no evidence in this record that all commercially available tetrabromophthalic anhydride would necessarily contain ferric ion [sic] in a proportion above the 5 ppm. which appellants consider to be the operative limit of their contribution. The use of commercially available tetrabromophthalic anhydride having a low iron content is equally obvious in the polyesterifications of the prior art as the high iron content urged by appellants.

Here, as in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923), it was *the discovery of the source of a problem,* not before known, *and* the discovery of a remedy for which appellants are entitled to the grant of a patent. When so considered, the invention here was not the mere use of a "pure" reactant to remedy an asserted source of difficulty. It lies rather in the perception of control of the amounts of the material which inhibited the esterification reaction.

Whether the reactants are "pure," or "impure," does not meet the issue. "Purity," at best, is a relative term lacking exact meaning except from the context in which it is used. As such, the general use of the term by the majority creates semantic difficulties. What, for example, is meant? "How pure is pure?" On this record, the use of "pure" reactants in the art would not alone make the claimed invention obvious under the conditions of section 103, for even a "pure" TBPAA might contain ferric iron in an amount in excess of 5 ppm.

Thus, in the second instance, the rejection is necessarily bottomed on what amounts to a lack of factual evidence as to criticality of the claimed limits.

The position that such limits are indeed critical as asserted by appellants remains unchallenged except for the examiner's unsupported "presumption" to the contrary.

Moreover, it is noted neither the examiner nor the board challenged applicants' assertions that a "practical industrial problem existed." Neither the examiner nor the board proffered anything controverting applicants' statement that "there was difficulty in preparing polyesters from commercially available TB PAA."

"Invention," as the term appears in the statute, means "invention or *discovery*." (35 U.S.C. § 100). Thus, if, in fact, a problem existed in this art, appellants' *discovery* of the causes of the problem coupled with their *discovery* of a solution to that problem constitutes an "invention," which is patentable unless barred by specific provisions of the statute.

The record here consists of *uncontroverted factual* allegations made by appellants. Taking an unduly broad view of the tests of section 103, the examiner substituted for factual proofs, his unsupported speculation that pure reactants would be used in the method and product of Lundberg. Thus, he reasoned, and the board agreed, that since a pure or iron-free reactant was available, applicants' invention was obvious. But if applicants' "invention" uncontrovertibly resides in both the *discovery* of a cause of a problem and a *discovery* of the solution to that problem, the reasoning to support the rejection begs the question.

The majority refers to Examples II and V of appellants' specification as not supporting appellants' position. The entire specification, however, contains Examples I, III and IV which also require consideration. These examples, when considered along with Examples II and V, produce a quite different picture than that reflected in the majority opinion and which, it seems to me, clearly offsets the examiner's "presumption." Thus, in Example I, we find a disclosure of a method of purifying the TBPAA to make it "suitable for conversion into polyester resins which are characterized by a remarkable flame retardancy." The purified TBPAA is disclosed as having but 2 ppm of ferric iron impurity. The examples then continue:

A mixture of 2.2 mol parts of diethylene glycol, 1.0 mol part of maleic acid anhydride and 1.0 mol part of tetrabromophthalic acid anhydride conditioned by treatment with methanol as described above, [which was conditioned by reduction of the ferric iron content] was heated rapidly to 170° in a slow stream of carbon dioxide. The mixture was agitated and heated at 170° until the evolution of water practically ceased and the acid number was 40. Thereafter, the mixture was cooled to 100° and 0.4 to 0.7 millimole part of hydroquinone and 3.2 mol parts of styrene were added. The mixture was agitated until homogeneous, after which it was cooled as rapidly as possible in an ice water bath.

In Example I, a further experiment was run and is described as follows:

Repetition of this experiment, in which an unconditioned tetrabromophthalic acid anhydride was used in place of the conditioned tetrabromophthalic acid anhydride, failed to give any polyester material. * * *

Example III describes the purification of TBPAA to reduce its ferric iron component from 8 ppm to 4 ppm. This purified material was used in the polymerization reaction described as follows:

A mixture of 49.9 parts of maleic acid anhydride, 232 parts of xylene-purified TBPAA and 117 parts of diethylene glycol was heated in an atmosphere of nitrogen to 175° C. The mixture was maintained at 175° C. to 180° C. for about 10 hours, at which time the acid number of the mass was 77.1. The mass was cooled to about 120° and 166.9 parts of styrene and a small quantity of hydroquinone were added. The mixture was cooled rapidly to ambient temperature.

The mixture was copolymerized in the manner described in Example I (b) to yield solid resin of excellent fire-retardant properties.

Example IV describes another method of purifying the TBPAA to reduce its ferric iron content to 1.2 ppm. The TB PAA so purified was then used as follows:

A mixture of 49.9 parts of maleic acid anhydride, 232 parts of TBPAA purified by the sodation method described above, and 117 parts of diethylene glycol was heated in an atmosphere of nitrogen at 170° to 180° C. for 12 hours, at which time the acid number of the polyester was 70.6. The mass was cooled to 120°, and 166.9 parts of styrene and a small quantity of hydroquinone were added. The mixture was cooled rapidly to room temperature.

The resulting polyester mass was copolymerized as described in Example II(b) to give a resin of excellent fire-retardant characteristics.

Appealed claims 1–5, 10, 11 are directed to appellants' method while appealed claims 6, 7, are directed to "a polyester resin," claim 8 to "a product resulting from the curing of the polyester resin claimed in claim 7," and claim 12 to "a polyester composition."

With respect to the method claims, I am of the view that appellants' contentions have merit and should be sustained. The board found, and appellants admit, that the art was aware that TBPAA could be used to prepare polyesters having fire-retardant properties. However, appellants allege that commercially available TBPAA is not suitable for the production of polyesters and that this difficulty is caused by the presence of ferric impurities in excess of 5 ppm in the TB PAA. Support for this allegation is seen in the specification, particularly in Example V of the application where it is

shown that commercially obtained TB PAA, containing 34 ppm ferric iron, could not be used to produce a polyester. Even 8 ppm of ferric impurity hinders the esterification reaction to the extent that polyesters cannot be consistently produced therefrom. On the other hand, TBPAA containing 5 ppm of ferric impurity or less consistently produced polyesters which have excellent flame-retardant characteristics as shown in other examples in the application. From the foregoing I conclude that appellants have demonstrated the criticality in the esterification process of the claimed limits on the amounts of ferric impurities in the TBPAA. Therefore, the rejection of claims 1–5 and 9–11 should be reversed.

The board's decision with respect to the method claims is that one skilled in the art would not be expected to employ an impure reactant and that there is no evidence in this record that all commercially available TBPAA would necessarily contain more than 5 ppm of ferric impurities. I find these contentions untenable. In the first place, I believe that one skilled in the art would not normally employ chemically pure reactants to produce resins for use in such relatively low cost consumer products as wall members, structural panels, pipe, electrical compacts and the like. It is to these items disclosed in appellants' specification to which we are directed for the usefulness of the fire-retardant compositions with which appellants are concerned. The question simply stated is whether it would be obvious for one of ordinary skill in producing resins for such uses to employ chemically pure TB PAA in the polymerization reaction. Except for Example V of the application, the record discloses little as to the amount of ferric iron impurities present in commercially available TBPAA. The sample there described contained 34 ppm of ferric impurities.[1]

1. It is interesting to observe at this point that appellants' specification states:

* * * Further, it has been stated that attempts to incorporate desirable flame-retardant properties into high polymer polyesters by use of chloro- and bromo- derivatives of phthalic anhydride for use in surface coatings

The thrust of the board's decision apparently would require appellants to show that *all* commercially available TB PAA contains more than 5 ppm of ferric iron. There is no basis for such a requirement in the statute or in reason.

The board also relies on the O'Neill, Tate and Hoffmann references to support the proposition that the art is aware of the need for purifying various phthalic acids prior to their use in esterification. I find nothing in any of these references which makes the presently claimed invention obvious. There simply is no teaching of any relationship between the ferric impurities in TBPAA and its successful use in an esterification process to produce fire-retardant resins. The simple fact is none of the references suggests the appellants' claimed critical ferric iron content of 5 ppm. The Hoffmann reference is relied on by the board as showing the removal of ferric impurities present in tetrachlorophthalic anhydride. However, it is clear that all Hoffmann in fact teaches is that iron chloride may be in the solution during the recrystallization of tetrachlorophthalic acid. This statement of a permissible procedure in the recrystallization of tetrachlorophthalic acid falls far short of establishing the obviousness under section 103 of appellants' discovery that a ferric iron impurity in excess of 5 ppm in TBPAA would seriously hinder or completely stop esterification reactions in which TBPAA was involved.

Study of the O'Neill, Tate and Hoffmann references verifies the accuracy of the observations in appellants' brief concerning these references that:

The O'Neill reference discloses a method for the purification of terephthalic acid. No mention is made of TBPAA or ferric iron and it is not understood how one of ordinary skill in the art would be taught the problem, the solution, or the special significance of TBPAA.

have been either unsuccessful or economically unattractive (Kirk-Othmer, Encyclopedia of Chemical Technology,

The Tate reference also discloses a method for the purification of terephthalic acid. Again, no mention is made of TBPAA or ferric iron. Tate speculates at column 2, lines 7 to 12, that "acidic or acid-forming impurities" are responsible for the production of undesirable esters, but he does not define "acidic or acid-forming impurities", which cover a broad class of materials. Be that as it may, Tate obviously does not disclose or suggest the problem of esterifying TBPAA, the solution, and the special significance of TBPAA.

The sixth and last reference relied on by the Board is the Hoffmann patent. This patent discloses a method for the purification of tetrachlorophthalic acid and its anhydride. No mention is made of TBPAA. The ferric iron mentioned is obviously present because of the use of ferric chloride as a chlorination catalyst in the preparation of tetrachlorophthalic acid. TBPAA is generally not prepared in the same manner * * *. However, Hoffmann does not state that ferric iron is responsible for the difficulty in the formation of polyester, and, even if the suggestion is assumed, there is no teaching that a limited amount of ferric iron can be present. Furthermore, Hoffmann does not, in any way, suggest the special significance of TBPAA.

It is therefore apparent that none of the references, alone or in combination, suggest that polyester resins of remarkable flame retardancy can be prepared by utilizing TBPAA that has not above 5 parts per million of ferric iron associated therewith. The references relied on are not concerned with the problem of esterifying TBPAA, do not offer a solution, and are not aware of the special significance of TBPAA in the fire retardant field.

Volume 10, page 595—Interscience Encyclopedia, Inc., 1953).

Claims 6, 7, 8 and 12 while generally in the form of "product" claims contain references to the "reaction product" (cl. 6–8) of "glycol and a component of the group consisting of saturated dicarboxylic acids and anhydrides" or to "a mixture of cross linking agents * * * resulting from condensation of about one mol of glycol with about one mol of dicarboxylic acid * * *." All of these claims contain the essential and critical limitation as to the ferric iron impurity in TBPAA not being above about 5 ppm. They thus embrace the essential elements of appellants' invention and appear to be little more than a permissible alternative way to claim their invention which resulted from a "surprising discovery" of the effect of the ferric iron impurity in the reaction for producing the desired fire-retardant resin. I therefore find them to be properly allowable claims.

It but further begs the question to find TBPAA as a known material in the prior art. It is the control of the ferric iron impurity therein which appellants related to the problem of utilizing TBPAA in polymerization reactions to produce fire-retardant resins. There is no question but that the art totally fails to teach this concept. The process and the product produced are clearly novel in this art. Thus, the only issue is whether under the tests of section 103 they are obvious.

In referring to the requirements of section 103, the Supreme Court in Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, (1966) stated:

> * * * The emphasis on nonobviousness is one of inquiry, not quality and, as such, comports with the constitutional strictures.

While the ultimate question of patent validity is one of law, A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. supra, at 155, 71 S.Ct. at 131, the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. * * *

The present ex parte record is not as fully developed here as it should be to permit a more accurate determination of the present issue. The only evidence directly bearing on the existence of the problem and its solution by appellants is found in their specification. The examiner has cited no art bearing directly on the issue, except as we ignore the "invention as a whole" requirement of section 103 and reconstruct the invention on a piecemeal hindsight basis. Even when this is done, the art totally fails to make obvious the critical limits of the ferric iron impurity claimed by appellants. To bridge this gap, the examiner "presumes" that one of ordinary skill in the art of manufacturing fire-retardant resins by the use of TBPAA would use chemically pure rather than commercially available TBPAA. Even here, he furnishes no "evidence" as to what would be obvious to one of ordinary skill in this art.

It seems clear to me that the intent of Congress expressed in the Patent Act of 1952 was to grant patents on an invention unless one of the statutory grounds for refusal was established. I do not consider the unsupported "presumption" of an examiner sufficient to establish obviousness under section 103 as interpreted by the Supreme Court in the *Graham* and *Adams* cases.

Judge Kirkpatrick's concurring opinion states:

> The difficulty with the appellants' case now before us is the lack of ade-

quate evidence to bring his application within the rule. There is nothing to show that the "problem" which the appellants claim to have solved is anything other than the perennial problem present in every industry, namely, how to improve the quality of the product or to make the process of manufacture more efficient. Certainly the mere fact that an applicant for a patent has succeeded in making an improvement in product or process is never of itself evidence of nonobviousness. It must appear that what he has done is not within the skill of the ordinary practitioner of the art. Here nothing has been offered to show that any problem other than the problem of how to improve the product and process existed.

As above pointed out, my disagreement is that I find in the specification "evidence," which in my opinion is far more persuasive than the "presumption" on which the examiner based the rejection. Briefly, it seems to me that an applicant should not be required to produce more "evidence" than was here presented until the examiner has overcome the prima facie case of patentability which I find in the present specification. Only after a properly supported rejection has been made is the burden of further proof properly placed on an applicant. It is a fact of which judicial notice is properly taken that this court, as well as other courts, as in *Adams* and in *Eibel,* have found patents valid when directed to nothing more than improving the quality of a product or making the process of manufacture more efficient. The fallacy is that *how* one improves quality of a product or efficiency of a process frequently involves unobvious patentable improvements, and this is as it should be within the terms of 35 U.S. C. § 101 which specifically includes "any new and useful improvement" on processes, machines, manufactures or composition of matter.

I would, therefore, reverse the decision of the board.