55 CCPA
**Application of Raymond WYNKOOP and Shirley C. Bartlett, Jr.**
**Patent Appeal No. 7884.**

United States Court of Customs and Patent Appeals.
Feb. 8, 1968.

Joseph Rossman, Philadelphia, Pa., for appellants.

Joseph Schimmel, Washington, D. C., (Fred W. Sherling, Washington, D. C., of counsel) for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals [1] affirming the examiner's rejection of claims 1-4 in application serial No. 209,345, filed July 12, 1962, entitled "Transformer Oil." No claim has been allowed.

The invention is a transformer oil with good resistance to oxidation, especially in the presence of metals. It functions satisfactorily without the addition of oxidation inhibitors. These inhibitors are apparently suspect in the industry. The marketability of a transformer oil is, therefore, enhanced if its stability is not dependent on them.

Claim 1 is illustrative:

1. A transformer oil comprising a naphthenic petroleum distillate boiling in the range of 460-775°F. having a viscosity in the range of 50-65 S.U.S. at 100°F., a viscosity-gravity constant in the range of 0.84-0.92 and a nitrogen content less than 4 p.p.m. and, when tested under Doble Oxidation Test conditions in the absence of an added inhibitor, exhibiting the following characteristics: (1) a neutralization number less than 0.25 mg. KOH/g. at 96 hours oxidation time; (2) absence of sludge at 96 hours oxidation time; and (3) power factors during the oxidation period of 0-96 hours consistently less than 2 per cent.

The other three claims are dependent, adding limitations.

The following references were relied upon:

Wasson et al. 3,000,807 Sept. 19, 1961
Schieman 3,095,366 June 25, 1963
(Filed Mar. 3, 1960)

Wasson et al. disclose a transformer oil which is a mixture of an acid-treated naphthenic distillate and a hydrofined naphthenic distillate. The product assertedly has an oxidation resistance su-

1. Consisting of Asp and Magil, Examiners-in-Chief, and Vertiz, Acting Examiner-in-Chief. The latter wrote the opinion.

perior to that of either component. Its boiling range and viscosity are similar to that of appellants' transformer oil. Its nitrogen content is not reported. The oils were subjected to the Doble Oxidation Test.[2] The relevant portions of the test data are mentioned below.

█ Schieman also discloses a blended transformer oil, a mixture of a decanted oil and a naphthenic lubricating oil. It is marked by good oxidation resistance. Schieman's oil also has a boiling range and viscosity comparable to appellants' oil. No data on its nitrogen content are given. Appellants, at the examiner's suggestion, arranged for a Doble test of the oil used in Schieman's example. Sludge appeared at the end of a 24-hour period; the power factor,[3] initially 0.8%, rose to 2% at 80 hours, and 7% at 180 hours.[4]

The examiner rejected the claims as "unpatentable over either Schieman or Wasson et al.," because there was "no way" for him to determine whether the

reference described oil having the same properties as those of appellants' oil. He stated, apparently referring to the Doble test limitations of the claims:

* * * it is the Examiner's position that applicants only obtained what is recognized as being desirable in the art and which is due to their improved refining process. In other words it is to be expected that an improved refining process would give a transformer oil more resistant to oxidation.

The board generally agreed. It also refused to attribute "patentable significance" to the low nitrogen content of the invention.

It seems that the compositions of the references, as nearly as we can tell, do not meet the Doble test specifications of appellants' claims. Wasson et al., for instance, disclose an absence of sludge for only 72 hours. Appellants' tests on the oil of Schieman's example showed an absence of sludge for only 24 hours. There appears to be novelty.

2. Wasson et al. describe the Doble test:
   In the Doble oxidation test an oil heated to 95°C. is blown with air in the presence of coils of copper and iron wire which serve as catalysts. At periodic intervals portions of the oil are withdrawn and examined for neutralization number, sediment formation (after 5:1 naphtha dilution) and interfacial tension. The time required for the formation of visible sludge, for the neutralization number to increase to 0.2 mg. per gram, and for the interfacial tension to decrease below 15 dynes per centimeter is reported. A satisfactory oil must have a life of at least 48 hours before reaching any of these three conditions.

3. Power factor is defined as:
   Power Factor—A numerical dimensionless value expressing the ratio of the power dissipated in an insulating material (watts) to the product of the effective voltage and current when tested in a sinusoidal electrical field under prescribed conditions of voltage gradient, frequency, temperature and previous (conditioning) treatment. The power factor numerically is equivalent to the cosine of the dielectric phase angle or the sine of the dielectric loss angle. (Insulating Materials for Design and Engineering Practice, 1962, p. 50.)

4. The solicitor did not think the affidavit, reporting these data, should be relied on, arguing:
   Since the affidavit is self-serving, it can be presumed that affiant did not choose the best reference oil. The situation is analogous to affidavits presented by experimenters who have no interest in producing successful reference products, and such affidavits are not accorded great weight.
   The examiner, on the other hand, insisted:
   * * * the burden is on applicants to show that the limitations recited in the claims are not inherent in the references and that these limitations are critical.
   The examiner also apparently suggested the specific oil to be tested. We think, under these circumstances at least, that the affidavit must be given some real weight. And here it is very nearly the only evidence on the point.
   The examiner and board did criticize the affidavit, apparently because of a misunderstanding of the way in which the power factor was reported. Appellants clarified this matter in their brief. The solicitor does not refer to it here.
   We cannot tell, of course, without a remand, how the clarification would have affected the decision below. Our disposition of the case, however, renders a remand unnecessary.

However, the question of obviousness remains. We think that insofar as appellants' claims are couched in terms of results admittedly sought after by the art, they could only with difficulty be adjudged, on those grounds, unobvious variants of the similar transformer oils of the references. We note, however, that the claims are also limited to compositions of less than 4 p.p.m. nitrogen. Appellants' specification states:

> The extremely low nitrogen content obtained by the above-specified treatment also is important in contributing to the outstanding stability of the present oils under the oxidizing conditions of the Doble Test, as it has been found that if the nitrogen content exceeds 4 p.p.m. the oil generally will have a Doble Test life of only about 2 days and a pronounced hump in the initial portion of the power factor curve will appear.

The board dealt with appellants' arguments summarily:

> With respect to appellants' argument regarding the nitrogen content of less than 4 p.p.m., we note that Schieman and Wasson et al. disclose acid treatment which will reduce the nitrogen content of their oils. We must assume that the nitrogen content is sufficiently low for their intended use and in the absence of a comparative showing, we will not attribute patentable significance to this factor.

We do not see how the references can fairly be read as disclosing the importance of the low nitrogen content specified in the claims, which, as their specification states, appellants appear to have discovered. It seems to us inadequate to assert that oils of the references *probably* had a low enough nitrogen content for their intended uses. In the absence of some showing that very low nitrogen content is recognized by the art as an advantageous quality in transformer oils, we cannot agree that this record provides a basis for the Patent Office assertion of obviousness. The decision of the board is, therefore, *reversed*.

*Reversed.*

ALMOND, Judge (dissenting).

While I agree with the conclusion of the majority that appellants' claimed oils are novel, I do not believe the majority has basis for deciding that the board erred in its obviousness rejection, and I believe their conclusion is contrary to the recent decision of this court in In re Spatz, 55 CCPA ——, 387 F.2d 663, 156 USPQ 39.

In that case, as in this, patentability was urged based upon the presence of a very low maximum amount of an impurity. In that case, as in this, the prior art taught purification techniques suitable to remove at least a portion of the impurity. In that case, as in this, the prior art was silent as to the amount of impurity present in its product. And in that case, as in this, the appellants failed to advance any evidence that the prior art materials differed substantially from their claimed material in the critical element.

In an amendment filed in the prosecution of this application, applicants' attorney stated:

> Applicants have found for a fact that the usual naphthenic charge stock for making transformer oil has a nitrogen content typically in the neighborhood of 50 p.p.m., the oil after acid treatment typically contains nitrogen in amount of 4–8 p.p.m. and the finally treated oil typically contains 1–2 p.p.m. of nitrogen. * * *

Since the references relied upon both provide for acid treatment of their oils, it would appear that their oils *typically* contain 4–8 p.p.m. of nitrogen. To hold that it is unobvious to have a nitrogen content of less than 4 p.p.m. in the claimed oil therefore seems to me to be erroneous.

Had appellants produced evidence showing the specific reference oils to have nitrogen contents above 4 p.p.m., I would agree that they had made out a case for patentability in view of their assertions of criticality of that maximum nitrogen content. But such evidence is not in this record. I would therefore affirm.