47 CCPA

Application of John O. ANTONSON.

Patent Appeal No. 6396.

United States Court of Customs
and Patent Appeals.

Dec. 15, 1959.

Martin, Judge, dissented.

Harold S. Meyer, Akron, Ohio, for appellant.

Clarence W. Moore, Washington, D. C. (Arthur H. Behrens, Washington, D. C., of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[1]

RICH, Judge.

This appeal is from the decision of the Board of Appeals of the United States Patent Office affirming the final rejection by the primary examiner of claim 27 of appellant's application serial No. 245,340 entitled "Tire Construction." Four claims have been allowed.

Appellant's tire construction, as his specification points out, relates, not to tires in general, but to the solution of problems in tires for airplanes having landing speeds of 200 miles per hour or more. The specification and appellant's brief point out some of the problems including the following: Space and weight limitations in aircraft limit tire size. This requires tires of high load-carrying capacity which means that inflation pressure is high, for example 210 pounds per square inch or more. Quoting from the specification:

"The high inflation pressure in the tires has reduced the flexing but the action of the forces resulting from the inflation pressure plus the high centrifugal force developed at high speeds has urged the radially outer wall of the tire outward changing the tread profile in cross section from a tread face having a large radius of curvature to a tread face with a small radius of curvature. The reduction in radius of curvature of the tread face has resulted in a reduction in the area of the tread

1. United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of* *Judge O'CONNELL*, pursuant to provisions of Section 294(d), Title 28 United States Code.

which supports the tire and an increase in stress concentration in the portion of the tire underlying the relatively small tread area which contacts the ground.

"The decrease in flexing of the tire walls has also caused an increase in the stresses within the tread as the forces which had been cushioned by the flexing of the walls in tires with relatively low inflation pressures have had to be cushioned by the deformation of the tread. The high stresses developed in the localized central portions of the treads have caused repeated deformation within the tread and *the concentrated stresses have generated excessive heat* leading to failure of the tire.

"The high centrifugal force developed at high speeds tends to throw the tread off the tire body and subjects the adhesive bond at the interface between the tread and tire body to exceedingly high stresses. In addition, *the sudden change in elasticity at the interface separating the highly elastic tread from the relatively stiff tire body has caused a weakness at the interface* in the tire at high speeds because of the tendency of the tread to move relative to the tire body and the inability of the tread and tire body to operate together to resist forces acting on the tire.

&ast; &ast; &ast; &ast; &ast; &ast;

"It can be seen that the problems encountered in high speed operation of tires are radically different from the problems of low speed tire operation and that a need for an improved tire construction has arisen with the advent of aircraft which land at high speeds of 200 miles per hour or more." [Emphasis ours.]

In thus quoting at length from the specification as to the nature of the problem, as disclosed by the appellant, we do not mean to imply that everything said in such disclosure was well known in the tire art. The obvious problem was simply the failure of tires on airplanes

landing at high speeds with heavy loads. Much of what we have quoted above is, in fact, appellant's own analysis of the causes of the failure which led him to the means for its solution. In cases of this kind it must not be lost sight of, as pointed out by the Supreme Court in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 67, 43 S.Ct. 322, 67 L.Ed. 523 that the inventive act which entitles an applicant to a patent resides as well in the discovery of the source of trouble as in the application of the remedy.

Appellant's solution of the problem involved placing *in the tread portion* of the tire a plurality of plies of reinforcing cord. In his illustrative examples there are two embodiments of this structure, each with three such tread reinforcing plies. As to the first the specification says:

"A group of tread reinforcing plies 18, 19, and 20 preferably constituting less than one half the total number of plies [including the carcass plies] are embedded in the tread 13 of the tire *to resist distortion of the profile of the tread by the action of the large aforementioned centrifugal forces* exerted upon the tire at high speeds *and the action of the high pressure inflating air* in the tire which tends to decrease the radius of curvature of the tread.

&ast; &ast; &ast; &ast; &ast; &ast;

"In operation of the tire 10 on aircraft which have landing speeds exceeding 200 miles per hour the tread 13 is restrained from excessive outward movement and *held by the group of plies 18, 19 and 20 embedded in the tread portion 13 to a transverse curvature with a relatively large radius.* Therefore the maximum area of tread surface is brought in contact with the ground at the light loads which are placed upon the tire in the high speed landing runs, and *the amplitude of deflection is held to a minimum.* There is a minimum amount of flexing of the tire and the *stresses accompanying*

the flexing action are distributed over a relatively large area so that the heat generated in the tread will be insufficient to cause failure. Furthermore by varying the elasticity of the tread face radially inward through the tire body 10 a sudden change in the modulus of elasticity does not take place at the interface between the tread 13 and the carcass portion of tire body 10. Instead the graduated change in elasticity provides for even distribution of the stresses over the entire tire providing long wearing qualities and increased strength." [Emphasis ours.]

The "graduated change" in the last sentence quoted above is effected by a specific feature of construction described in the specification as follows, referring to a description particularly relating to the second illustrative embodiment:

" * * * the group of plies in the tread 23 are separated by layers of rubber of increasing thickness as the plies approach the tread face. As shown in Fig. 4 the inner ply 27 is closer to middle ply 28 than the outer ply 29 is to the middle ply 28 and this graduated spacing is desirable in that it provides a tire with increasing elasticity toward the tread face 23. Also the proximity of the outermost plies 28 and 29 to the face of the tread 23 provides maximum resistance to distortion of the tread in operation and provides increased stability of the tire."

The foregoing should sufficiently indicate the nature of the invention which is set forth in the single claim on appeal reading as follows, the italicized portions being the portions particularly relied upon for patentability of the overall combination as distinguishing it from the prior art:

"27. A high speed generally toroidal pneumatic tire having laterally spaced radially inward bead portions, a generally toroidal carcass portion connecting said bead portions, and a peripheral tread portion having a smooth ground engaging surface, said carcass portion comprising a plurality of crossing biaslaid plies of cord material extending from bead to bead and embedded in rubber, said tread portion comprising a body of tread rubber bonded to said carcass portion, said tread rubber having imbedded therein radially outward of said carcass plies at least three tread plies, said tread plies each comprising a layer of elongated generally parallel cords embedded in rubber with the individual cords in each ply extending generally transversely of the tire at an acute longitudinal bias angle to the circumferential center-line of the ply, and with each tread ply extending circumferentially of the tire, and stopping a substantial distance short of said beads in the lateral extent of the ply, said tread plies being radially spaced from one another by distances greater than the distances between the plies in the carcass portion with the outermost tread ply disposed adjacent the periphery of the tread and with the innermost tread ply spaced from said carcass plies, the radial spacing of said tread plies progressively decreasing from the radially outer to the radially inner plies." [Emphasis ours.]

The Board of Appeals likewise had only this claim before it. The references relied on are:

| | | |
|---|---|---|
| Tuttle et al. | 1,616,069 | Feb. 1, 1927 |
| Musselman | 1,846,269 | Feb. 23, 1932 |
| Hopkinson | 2,006,315 | June 25, 1935 |
| Lejeune | 2,153,965 | Apr. 11, 1939 |
| Purdy | 2,432,630 | Dec. 16, 1947 |
| Liais (France) | 429,519 | Sept. 25, 1911 |

The examiner's answer states that the claim stands rejected "on the patents to Musselman, Lejeune or Liais in view of Hopkinson, Tuttle et al. and Purdy" and concludes by saying, "The teaching in the secondary references would fairly suggest to one skilled in the art how the basic references could be modified to obtain the structure of claim 27."

The Board of Appeals states in its opinion, "The claim was rejected as being unpatentable over any one of Musselman, Lejeune or Liais in view of either Hopkinson, Tuttle et al. and Purdy" and affirmed because it felt the claim was to a combination of known features "where each feature performs its normal function and gives only its own result." We feel however, that these conclusions were not justified by the references and that the claimed combination would not be reached by the application of the ordinary skill of the art in the absence of applicant's teaching. Our reasons will appear in the following consideration of the references, not one of which recognizes the peculiar problems which faced the applicant.

The patent to Purdy can be quickly disposed of. It was cited only for its showing of *bias laid* cords, a feature not relied on for patentability. The board attached no patentable significance to this limitation of the claim, with respect either to the carcass or tread plies, neither does appellant, and neither do we. Before leaving this patent it is noted that it is the most recent of the six references, having issued in 1947 on an application filed in 1942. The other references issued between 1911 and 1939. We shall now take them up in chronological order.

The patent to Liais is a French patent (1911) of which the board said only this:

"In Liais, it appears clear to us that the elements 4 constitute two reinforcing fabric tread plies embedded in the tread layer applied to the carcass plies 2 and 3."

In summarizing all of its views, one of the points made by the board was that "the use of reinforcing plies in tire treads is well known" and the Liais patent seems to have been, as will appear, the best support the board had for that assertion. The Liais disclosure therefore deserves careful consideration. Liais' invention resided in "a special mode of construction of the carcasses constituting the linings of the casings." [1] It consisted of combining, to make up the carcass, layers of cloth with bias threads and layers with "straight" threads. He proposed to alternate these layers or to alternate groups of bias with groups of straight thread cloth. He illustrated his invention with two figures, showing the two forms of carcass. Over most of the carcass in each figure is a layer of crescent-shaped cross-section, extending from near the beads on each side and over the part of the tire where the tread of a modern tire would be. This layer increases in thickness from each side toward the tread center line in true crescent shape. The description of this part reads, "1 is the elastic material of the casing." That is *all* that is said about it. In the central portion of the "elastic material," in what one might term the tread portion of the tire, the drawing shows two curved dashed lines marked "4," spaced somewhat further from the outside of the carcass layers than they are from the outer wall of the tire and spaced apart by a distance somewhat less than either of these spacings. The lines are parallel and underlie that part of the tire which would be the tread if it had one. All that the patent says in explanation of these lines is, "et 4 les toiles dites 'de croissant'." Appellant translates this "and 4 the cloth called 'of the crescent' [tread plies].' The Patent Office translation is "and 4, the so-termed 'de croissant'* fabrics. *'Croissant' (French): Crescent, crescent-shaped, and tread (of tire) are some of the meanings of this word." The most we can see in this disclosure, to put our own interpretation on

---

1. We have two English translations of this patent and where it is a matter of indifference, we have used the one supplied by appellant. The other was furnished by the Patent Office.

it, is that the patent says the lines marked "4" indicate tread fabrics. Apparently it was assumed that French tire builders of 1911 would understand. Neither structure nor function is explained. We do not think this would suggest to anyone in 1951, when appellant filed, how to keep the treads, which are not "croissant" shaped, from flying off of airplane tires when they roll along the ground at over 200 miles an hour. We note that there were but two "toiles," that they were fabric and not cord, and that they were not spaced as called for by the claim, so that in no case does claim 27 read on this disclosure. There is, of course, no suggestion of appellant's problems or of his solution for them.

Tuttle, filed in 1920, is the next in point of time. It was relied on to anticipate the feature of claim 27 calling for the particular spacing of the tread plies therein set forth. In Tuttle there are no *tread* plies at all but he discloses a progressive increase in the spacing of his *carcass* plies from the inside out and at the same time an increase in the looseness of the fabric weave. He says this gives him "remarkable results * * * in wearing qualities" and that he is "unable * * * to give any adequate or extended information as to the reasons for the improved wearing qualities." No mention is made of the use of the tires but they would appear to be for conventional automotive use.

Musselman, filed in 1927, discloses a "balloon tire and wheel" for airplanes, to give a cushioning effect when landing on a very rough surface. The tire casing (C), which is to be used with an inner tube, is made from a single piece of cotton fabric to be cut with the weave, sewed into a tube which is turned in on itself and provided with draw-strings to hold it on the wheel hub, resulting in shirred sidewalls. In effect the tire becomes the wheel which consists of little more than a hub with flanges. The whole of the relevant disclosure is:

"Preferably a suitable tread 28 is applied to the casing C. The tread may be reinforced, if desired, by means of fabric (not shown). The tread may be vulcanized to the casing fabric, if desired."

The drawing nowhere shows any kind of tread reinforcement. Without mentioning the nature of this tire-wheel, the board seems to have taken the foregoing disclosure as justifying, at least in part, its conclusion that the use of reinforcing plies located internally of the tread is well known. We cannot so regard it. The fabric reinforcement in Musselman could as well have been cemented to the inside or outside of the "tread," considering the nature of the tire, which is described as very light, very soft, carrying a very small air pressure "so that in landing the tire will spread out over a very large area so as to provide a very great cushioning effect, at the same time adapting itself to the contour of the ground with which it comes in contact." We think this reference is entitled to no weight whatever. It is the only airplane tire of record, obviously useful only on very light, relatively slow speed planes.

Hopkinson was relied on by the board as disclosing "protective plies *in the tread rubber.*" [Emphasis ours.] The board also said, "this patent is merely cumulative to Liais in its disclosure of two reinforcing plies in the tread." These statements create a false impression as to where Hopkinson's "protective plies" actually are. The description in the patent makes it clear that they lie *between* the carcass and tread portions of the tire. The patentee explains that the practice had been to place breaker strips treated with soft rubber on top of the outermost carcass layer and to place tread stock over the breaker strips. He then says:

"*In lieu of the breaker strip or strips* * * * I extend one or more protective plies around the tire from one bead heel to the other. * * * The protective plies are treated, preferably *skim coated,* with a rubber stock having the characteristics of the tread stock. Accordingly, *when the tread stock is applied over the protective plies,* the tread stock merges with the coating on the protective plies and the pro-

tective plies are *in effect* embedded in the tread stock." [Emphasis ours.]

The board was relying on words rather than substance. The only factor that makes it possible to say that the protective plies are "in the tread rubber," as the board did, is the fact that they are skim coated with tread rubber instead of the softer rubber used in cementing together the carcass plies. Obviously they will end up, upon vulcanization, on the inside face of the tread and will not be "embedded" in it in the manner called for by appellant's claim 27. They certainly will not be anywhere near the periphery of the tread and spaced inwardly therefrom by progressively decreasing distances.

The last reference left for consideration is Lejeune, who filed in 1936, based on a 1934 French application. The board did not discuss this reference and referred to it only incidentally in saying that tread reinforcing plies must necessarily extend circumferentially and in saying further that selection of the number of plies was merely a matter of design, alleging that Lejeune showed one such ply. We do not find any "reinforcing plies" at all in Lejeune for the simple reason that he does not disclose a rubber tire. What he discloses is a pneumatic "tire cover" for cycles and automobiles which is made of a specially woven and treated cotton fabric impregnated with rubber latex. The drawings are schematic and though they may appear to show a rubber tire in places, no such tire is described in the specification. It is a fabric tire, woven on a circular loom of special cotton threads or cords which are treated with caustic to swell them, neutralized, shaped, dried and impregnated by dipping in a vat of liquid latex. They are then drip-dried and vulcanized. In one form the tread portion has two layers of fabric. Since there is no reinforced rubber but only latex impregnated fabric, this reference is entitled to no weight.

We shall now sum up our views on the references. No weight can be given to Purdy, Musselman or Lejeune for the reasons stated. Hopkinson does not disclose reinforcing plies within the body of the tread of the tire as explained above. The casing ply arrangement of Tuttle et al., which is said to improve tire wearing qualities for reasons he does not understand and cannot explain, in no way suggests reinforcing the tread, to say nothing of putting an arrangement of plies into it similar to those in his casing. What seems to be the closest reference in point of disclosure of tread reinforcement, the 1911 Liais French patent, is so lacking in disclosure as to teach nothing to any one who did not already fully understand the significance of two broken lines described as "les toiles dites 'de croissant'." We do not understand it, appellant claims not to and the Patent Office has shed no further light on the subject. We feel that what light there is glows so dimly as to be totally ineffective as a suggestion which would make appellant's claimed invention obvious to any one and certainly not to one of ordinary skill in the tire making art faced with the practical problem of preventing the destruction of airplane tires, inflated to over 200 pounds, by landings at over 200 miles per hour.

The failure of the references, singly or in combination, to suggest any of the specific limitations of claim 27 which we have emphasized, and upon which appellant principally relies for patentability over the prior art, should be evident from the foregoing discussion and we see no need to point it out in further detail. Beside a failure to suggest a structure which meets the quite detailed limitations of claim 27, not one of the references even approaches the problem of high speed airplane tire failure or supplies any information as to why tires fail in such service. Appellant has not only determined the causes of failure but has designed a structure which remedies, apparently with practical success, the shortcomings of prior tires in this service.

The decision of the board is reversed.

Reversed.

MARTIN, Judge (dissenting).

I am constrained to disagree with my colleagues in this case.

Appellant does not apparently contend that any part of the basic structure of his tire, other than the supporting cord ply construction of the tread, is novel. Yet he does contend and the court has found, that it is unobvious to increase the thickness of rubber layers between the cord plies of the tread, outwardly towards the periphery thereof. To me the varying cord ply spacing is the only element in the claim upon which patentability could possibly be predicated, and I am unconvinced that such a feature is one which would be unobvious to one of ordinary skill in the art.

The appealed claim recites the provision of " * * * at least three tread plies * * *, the radial spacing of said tread plies progressively decreasing from the radially outer to the radially inner plies." The specification states only that " * * * this graduated spacing is desirable in that it provides a tire with increasing elasticity toward the tread face * * *." Whatever may be the advantages of appellant's commercial tire, achieved by varying the longitudinal bias angle of the tread reinforcing cords in order to improve stress distribution, or by utilizing a simple tread design, these limitations are not recited in the appealed claim. The claim solely requires *three* plies in the tread with a variation in thickness in the *two separating layers* of rubber. The only disclosed advantage *in the record* relates to " * * * increasing elasticity * * * "; I deem it obvious to the skilled technician in this art, in view of the teachings of Tuttle and Hopkinson that by increasing the proportion of tread rubber relative to the reinforcing cords, the elasticity of the tread would be increased.

In order to apply the teachings of a reference in combination with another to meet the recitations of a claim, the disclosure of the former need not be bodily incorporated into the latter. In re Att-

wood, 45 CCPA 824, 253 F.2d 234. That Tuttle and Hopkinson teach varying the rubber thickness in the *carcass* rather than in the *tread* is not therefore crucial; it is Tuttle's and Hopkinson's disclosures of the inherent advantages of variation of thickness of rubber separating layers between cord reinforcing plies which provides the needed concept. Thus, it would be obvious to the skilled technician in this art to modify the broad structural combinations including multiple cord plies in the tread taught by Lejeune, Hopkinson, Musselman or Liais, by increasing the proportion of rubber outwards towards the periphery of the tread so as to "increase elasticity," when informed by Tuttle of the inherently improved " * * * wearing qualities * * * " and " * * * longer life * * * " of tires, and by Hopkinson of the cushioning effect against severe blows which cushioning effect tends "to prevent the separation of the outer plies from each other," when rubber thickness between supporting plies is increased radially outwards.

In view of the above, I would affirm the decision of the Board of Appeals.